**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

PATTY L. BIVENS,                      §
     Plaintiff,                     §
                        §
v.                                    §      Civil Action No. 3:20-CV-1904-K-BH
                        §
ANDREW SAUL,                          §
COMMISSIONER OF SOCIAL                §
SECURITY ADMINISTRATION,              §
     Defendant.                     §      Referred to U.S. Magistrate Judge[1]

## <u>FINDINGS, CONCLUSIONS, AND RECOMMENDATION</u>

Patty L. Bivens (Plaintiff) seeks judicial review of a final decision by the Commissioner of

Social Security (Commissioner) denying her claims for Disability Insurance Benefits (DIB) and

Supplemental Security Income (SSI) under Titles II and XVI, respectively, of the Social Security

Act (the Act), 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3). (docs. 1, 20.)  Based on the relevant filings,

evidence, and applicable law, the Commissioner's decision should be **REVERSED in part**, and

the case should be **REMANDED** for further proceedings.

## I.        BACKGROUND

On May 23, 2017, Plaintiff filed her application for DIB and SSI, alleging disability

beginning on September 18, 2016. (doc. 20 at 5-6.)[2] Her claim was denied initially on August 2,

2017 (*id.* at 17-1 at 131-150), and upon reconsideration on December 8, 2017 (*id.* at 153-72). On

February 5, 2018, Plaintiff requested a hearing before an Administrative Law Judge (ALJ). (*Id.* at

---

[1] By *Special Order 3-251*, this social security appeal was automatically referred for proposed findings of fact and recommendation for disposition.

[2] Citations to the record refer to the CM/ECF system page number at the top of each page rather than the page numbers at the bottom of each filing.

17.) She appeared and testified at a hearing on November 28, 2018, and at a supplemental hearing on May 30, 2019. (*Id.* at 85-101, 105-30.) On October 23, 2019, the ALJ issued a decision finding her not disabled. (*Id.* at 46.)

Plaintiff timely appealed the ALJ's decision to the Appeals Council on October 30, 2019. (*Id.* at 13.) The Appeals Council denied her request for review on May 29, 2020, making the ALJ's decision the final decision of the Commissioner. (*Id.* at 6-10.) She timely appealed the Commissioner's decision under 42 U.S.C. § 405(g). (doc. 1.)

**A.  Age, Education, and Work Experience**

Plaintiff was born on January 5, 1964; she was 54 years old at the time of the first hearing and 55 at the time of the second. (doc. 17-1 at 85, 107.) She had completed high school as well as some college course work. (*Id.* at 106, 108.) She had past relevant work as a customer service representative, home attendant, teacher's aide, and mail room clerk. (*Id.* at 124.)

**B.  Medical, Psychological, and Psychiatric Evidence**

On May 27, 2016, Plaintiff presented to Christus Santa Rosa Medical Center (CSRMC) in San Antonio, Texas, for abdominal pain/atypical chest pain and was seen by Carlos A. Nieto Fonseca, M.D. (*Id.* at 509-12.) She had normal tone, bulk, and movement of all extremities. (*Id.* at 510.) Plaintiff was diagnosed with morbid obesity, asthma, hyperglycemia, hypertension, vertigo, chronic sinusitis, and hyperlipidemia. (*Id.* at 506.)

On September 20, 2016, Plaintiff returned to CSRMC after a motor vehicle accident. (*Id.* at 537.) She complained of shoulder pain, but shoulder imaging was normal; she was diagnosed with muscle spasm and discharged in stable condition. (*Id.* at 539.) Plaintiff returned the next day due to pain in her right shoulder when she moved it. (*Id.* at 552.) At discharge, she was noted as being ambulatory.  (*Id.*)

From September 27, 2016, to December 20, 2016, Plaintiff was treated at River City Chiropractic in San Antonio with electric muscle stimulation, mechanical traction, and spinal adjustments. (*Id.* at 605, 607, 609, 611, 613, 615, 617, 619, 621, 623, 627, 631, 633, 635, 637, 639, 641, 643, 645, 647, 649, 651, 655, 659, 661, 663, 665, 669.) She continued to exhibit some tenderness and muscle tension. (*Id.* at 654, 661, 663, 665, 667-68.) Eric Salinas, D.C., diagnosed her with radiculopathy of the cervical and lumbar region, sprain of ligaments, unspecified sprain of the right shoulder, cervicalgia, disc displacement, and other specific joint derangement. (*Id.* at 603, 605, 607, 609, 611, 613, 615, 617, 619, 621, 623, 627, 631, 633, 635, 637, 639, 641, 643, 645, 647, 649, 651, 655, 659, 661, 663, 665, 659.) He expected her to "require further medical management and periodic orthopedic evaluations" and to "experience exacerbations of her symptoms." (*Id.* at 670.)

On October 13, 2016, Plaintiff presented to CSRMC for a primary assessment. (*Id.* at 552, 829.) Ioannis J. Berios, DO, noted she had a normal gait and required no ambulatory aid. (*Id.*)

On October 25, 2016, Hugo Alonzo Rojas, M.D., at Family Clinics of San Antonio (Family Clinics), noted that Plaintiff had muscle spasms and limited range of motion in the cervical and lumbar spine. (*Id.* at 689-90.) A handwritten note on the medical record indicated she had right shoulder pain with severe limitation, could not raise her arm above the shoulder, and had "10/10" pain. (*Id.* at 690.) Dr. Rojas diagnosed her with neck, lumbar, and shoulder strain/sprain, and he ordered imaging of the cervical and lumbar spine and right shoulder. (*Id.*)

On October 27, 2016, Plaintiff presented to Premier Medical Imaging in San Antonio for a Magnetic Resonance Imaging (MRI) of her cervical spine, which revealed disc herniation indents and disc bulge flattening of the thecal sac at C3-4. (*Id.* at 673-74, 677-78, 683-84.) On November 7, 2016, she returned for x-rays of her right shoulder, which revealed a tear of the distal

supraspinatus tendon, the acromioclavicular joint revealed joint space narrowing with mild articular hypertrophy; a Type III acromion with mild impingement. (*Id.* at 575, 680.) The same day, she also had an MRI of the lumbar spine, which revealed no subluxation or retrolisthesis, disc desiccation at the L4-5 and L5-S1 levels, an annular disc bulge at L4-5, and a diffuse disc bulge at L5-S2 with bilateral facet joint arthrosis and mild bilateral foraminal narrowing; L1-2, L2-3, and L3-4 levels were unremarkable. (*Id.* at 676, 681.)

On December 7, 2016, Plaintiff presented to orthopedic surgeon, Elliot I. Clemence, M.D., at South Texas Center for Orthopaedics in San Antonio, for right shoulder pain. (*Id.* at 685.) Plaintiff rated her pain as "7/10 to include night pain, pain with pushing, pulling, lifting, reaching and overhead work", and it radiated to her scapula and neck. (*Id.*) Her range of motion of the shoulder was "2/4 with pain," and she had "positive supraspinatus, deltoid, Hawkins, Neer, and apprehension signs, weak rotator cuff, tenderness around the anterior and posterior acromion, scapular tenderness[,] and trapezial tenderness." (*Id.*) Dr. Clemence noted that she weighed 264 pounds. (*Id.*) He diagnosed her with rotator cuff tear of the supraspinatus, and recommended open repair of the rotator cuff tear. (*Id.*)

On December 13, 2016, Plaintiff returned to Dr. Rojas at Family Clinics for back pain. (*Id.* at 687.) He diagnosed her with lumbar and cervical disc herniation and rotator cuff impingement of her right shoulder and prescribed her Norco for the pain. (*Id.* at 687, 691.)  She followed up with him again on February 27, 2017. (*Id.* at 686.) He noted lumbar spasms and limited range of motion and continued her on Norco. (*Id.*)

On July 12, 2017, Plaintiff underwent a consultative physical examination by Mahmood Panjwani, M.D., P.A., in Carrollton, Texas. (*Id.* at 697-701.) He noted that she took small steps, used a "walking cane," and complained of chronic neck and low back pain with radicular

symptoms, arthritis with bilateral knee pain, and right shoulder pain. (*Id.* at 697, 699.) She was alert and oriented times three, but tearful. (*Id.* at 699.) Her motor strength was "5/5" in all muscle groups tested, her fine finger movements were normal, and she had a "normal ability to handle small objects and button buttons on clothing." (*Id.* at 700.) She was 5'5" tall, weighed 264 pounds, was unable to bend down fully, and did not attempt to squat or walk on her toes, heels, or in a straight line. (*Id.* at 699-700.) Dr. Panjwani diagnosed her with chronic neck pain and low back pain with radicular symptoms, arthritis with bilateral knee pain, and chronic right shoulder pain with history of rotator cuff tear. (*Id.* at 701.)

On August 1, 2017, Plaintiff visited the urgent care clinic of Parkland Health and Hospital System (Parkland) in Dallas, Texas, for back pain. (*Id.* at 734-35.) Joychristine Palmer, RN, noted that she exhibited no edema and "ambulate[d] with steady gait to room." (*Id.* at 734, 739.) An x-ray of the thoracic spine showed "severe degenerative changes" "with no subluxation seen in the upper and mid cervical regions." (*Id.* at 737-38.) Additionally, mild discogenic and facet degenerative changes were most prominent at L4-5. (*Id.*)

On August 2, 2017, Yvonne Post, D.O., a state agency medical consultant (SAMC), reviewed Plaintiff's treatment record and completed a physical residual functional capacity (RFC) assessment. (*Id.* at 131-50.) She found that Plaintiff had the following physical RFC: lift and/or carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk for 4 hours in an 8-hour workday; sit for about 6 hours in an 8-hour workday; unlimited push and/or pull (including operation of hand and/or foot controls) except for the lift and/or carry restriction; occasionally stoop, kneel, crouch, crawl; climb ramps/stairs, ladders/ropes/scaffolds occasionally; and balance frequently, with no postural, manipulative, visual, communicative, or environmental limitations. (*Id.* at 137, 147.) Dr. Post considered that Plaintiff had some disorders of the back/discogenic and

degenerative (DDD) and osteoporosis in her right knee, and was able to "prepare simple meals, do light household chores, drive a car, and shop in stores." (*Id.* at 135, 137, 145, 148.) Dr. Post expressly concluded that Plaintiff's limitations were partially supported by the medical evidence of record. (*Id.* at 135-36, 138, 145-46, 148.) He found that Plaintiff demonstrated the maximum sustained work capability for light work. (*Id.* at 139, 149.)

On August 9, 2017, Plaintiff returned to Parkland for hypertension and "off and on" chest pain. (*Id.* at 732.) Nazia Khatoon, M.D., noted that Plaintiff "walked to the room with the help of the cane normally but now states she is in 10/10 pain and unable to stand and falling down." (*Id.* at 732, 734.) Dr. Khatoon gave her diet and exercise counseling, noting that her narcotic pain medication would not be refilled and that Plaintiff "left walking normal." (*Id.* at 734.)

On August 22, 2017, Plaintiff returned to urgent care at Parkland for back and abdominal pain. (*Id.* at 726-27.) Anitra Nikol Isom, RN, noted that Plaintiff "ambulate[d] to room with steady gait." (*Id.* at 727.) On examination, she had a normal range of motion and exhibited no edema. (*Id.* at 728.) At discharge, she "ambulat[ed] without assistance, with steady gait." (*Id.* at 727, 731.)

On August 28, 2017, Plaintiff went to the Parkland emergency room after experiencing palpitations and some chest pain during a dobutamine stress test at the cardiology clinic. (*Id.* at 707-08, 712.) She was alert and oriented times four, and she walked with a "steady independent gait." (*Id.* at 707.) She reported being out of some of her medications, not taking some of her medications for at least a month, never having taken her diabetes medication, and not having followed a "low carb diet." (*Id.* at 714.) She was diagnosed with EKG abnormalities and chest pain. (*Id.* at 717, 719.) She was "ambulatory" at discharge. (*Id.* at 722.)

On November 27, 2017, Plaintiff presented to Victoria Olajumoke Udezi, M.D., at Parkland for an annual physical exam; her gait was normal. (*Id.* at 891.)

On December 7, 2017, SAMC Tom Dees, M.D., completed a physical RFC assessment that mirrored Dr. Post's assessment. (*Id.* at 153-72.) He expressly noted that Plaintiff had moved to a different area and established care. (*Id.* at 160, 170.) He also noted that she had a medical visit in August 2017 for chronic back pain; her August 2017 x-rays showed DDD; an August 2017 examination found tenderness to palpation over her cervical, thoracic, and lumbar spine; she had a limited range of motion in her right shoulder due to a past rotator cuff tear; and she had "5/5" muscle strength bilaterally, intact sensation, and normal gait. (*Id.* at 160, 170.) He affirmed Dr. Post's opinion finding that Plaintiff's alleged limitations were partially supported by the medical evidence. (*Id.* at 158, 160, 168, 170.)

On January 8, 2018, Plaintiff was treated at Parkland for pelvic pain, back pain, chronic pain of both knees, and abnormal perimenopausal bleeding; she requested stronger pain medications. (*Id.* at 871-72; 877.) Her gait was antalgic, and there was no midline tenderness in the spine. (*Id.* at 872.) She exhibited tenderness to palpation of the left lateral and mid-thigh; there was no edema or spasm. (*Id.*) She was diagnosed with a bulging lumbar disc and prescribed Cyclobenzaprine. (*Id.* at 873.)

On January 22, 2018, Plaintiff presented to Parkland for chronic pain of both knees and a medication refill. (*Id.* at 865.) She was diagnosed with chronic pain of both knees and bulging lumbar pain. (*Id.* at 867.) She was also referred to pain management and physical therapy, where she presented with "gait impairment, mobility impairment, postural dysfunction, muscle imbalance, mechanical low back pain/dysfunction, lumbar derangement, and movement impairment." (*Id.* at 867-68.)

On June 4, 2018, Plaintiff returned to Parkland for a pain management evaluation of her knee, back, and shoulder. (*Id.* at 853, 857.) Knee x-rays revealed mild-moderate degenerative

changes. (*Id.* at 850.) She had a normal gait and was using a cane. (*Id.* at 857.) On examination, she had multiple tender points and limited flexion of the neck; her Faber test and straight leg raising were negative, and she had "5/5" strength bilaterally. (*Id.*) She was neurologically intact. (*Id.*) John C. Alexander, M.D., reviewed imaging of her back and shoulder and diagnosed her with osteoarthritis of the knee, musculoskeletal pain, shoulder pain, and lumbago. (*Id.* at 857-58.) He also recommended weight loss and prescribed Voltaren cream. (*Id.* at 853, 858.)

On June 18, 2018, Plaintiff returned to Parkland for a left thumb injury. (*Id.* at 845.) She reported that a splinter had gone into her left thumb when a dresser fell on her hands the week before, and that she had been doing some household chores but had been uncomfortable. (*Id.*) She walked with a cane, she had a mild edema in the right thumb, and she had no spasms. (*Id.*) She was assessed with thumb injury and chronic pain of both knees, and a splinter was removed from her left thumb. (*Id.*) She requested a disability parking placard, which Dr. Udezi prescribed. (*Id.*)

On September 10, 2018, Plaintiff presented to Parkland for knee and back pain. (*Id.* at 835.) She reported that her lower back pain was worsening, and she wanted spine injections instead of knee injections. (*Id.*) She reported having knee pain for a "long time", but her back hurt more, and she had recently fallen. (*Id.* at 841.) Plaintiff was assessed with chronic pain of both knees and primary osteoarthritis of both knees. (*Id.* at 840.) She was referred for an updated MRI of her spine and given a follow-up. (*Id.* at 841.)

On October 12, 2018, Plaintiff presented to Parkland for lumbar back pain. (*Id.* at 897.) A lumbar spine MRI revealed prominent posterior epidural fat at the lumbar level with narrowing of the thecal sac, and mild degenerative changes. (*Id.* at 897-98.)

On November 1, 2018, Plaintiff presented to Parkland for a headache, stuffy/runny nose, and itchy left eye. (*Id.* at 949.) She was prescribed a saline nasal spray and advised to maintain a healthy weight, plan regular exercise, and take medications as recommended. (*Id.* at 950.)

On February 8, 2019, Plaintiff presented to Matthew Paul Bunker, M.D., at Parkland, for a pain management follow-up. (*Id.* at 925.) He noted she was positive for facet loading pain, straight leg raises, and Faber test. (*Id.* at 929.) She had "5/5" strength bilaterally and used a cane to ambulate, as she had reportedly been doing "for the better part of a year." (*Id.* at 925, 929.) She was diagnosed with lumbago, lumbar radiculopathy, arthropathy of lumbar facet joint, and epidural lipomatosis, and she was referred for epidural steroid injections. (*Id.* at 930.)

On February 26, 2019, Plaintiff returned to Parkland, complaining of shoulder, back, and abdominal pain. (*Id.* at 920.) She exhibited decreased range of motion in the bilateral shoulders and was assessed with chronic right shoulder pain. (*Id.* at 921.) She reported indiscriminate eating and weight gain, and she asked for a referral for water aerobics, which had been recommended to her in the past. (*Id.* at 920.) She was advised to walk for 10-15 minutes after every meal and to limit her intake of fried or fatty foods. (*Id.* at 921.)

On March 13, 2019, Plaintiff presented to Parkland's emergency room for a second motor vehicle accident. (*Id.* at 903.) She weighed 266 pounds and had a BMI of 44.4. (*Id.* at 906.) She exhibited tenderness in the cervical spine and had "5/5" muscle strength, ambulated independently and without difficulty, had a steady gait, was neurologically intact, and had normal sensation and strength in upper and lower extremities bilaterally. (*Id.* at 906-07.) A CT scan of the cervical spine revealed no acute changes. (*Id.* at 907.) She was assessed with "other headache syndrome" and neck pain and was prescribed Cyclobenzaprine and Ibuprofen. (*Id.* at 908.)

On April 5, 2019, Plaintiff presented to Family Nurse Practitioner (FNP) John Siachitema (FNP Siachitema) at Parkland. (*Id.* at 958.) Bilateral knee x-rays revealed joint space narrowing in the medial compartment in both knees; she had decreased activity tolerance and antalgic gait. (*Id.* at 963, 982-83, 989.) She weighed 265, and her BMI was 43.5. (*Id.* at 963.) Sensory exam was grossly intact throughout the bilateral upper extremities, and she had tenderness over the cervical, thoracic, and lumbar spine. (*Id.* at 964.)  She was assessed with cervical stenosis and lumbar degenerative changes, diagnosed with chronic knee pain, referred for physical therapy, and advised to use a cane. (*Id.* at 964, 991.)

On April 10, 2019, Plaintiff presented to Parkland for a physical RFC assessment, completed by FNP Siachitema, who noted that he had provided primary care "approximately" "every 3 months" since October 22, 2018. (*Id.* at 952.) He diagnosed Plaintiff with right shoulder pain, bulging lumbar disc, chronic pain of the knees, asthma, hypertension, gastroesophageal reflux disease, rotator cuff tear, upper back pain, and joint pain. (*Id.*) He opined that she had the following limitations: lift less than 10 pounds, stand and walk less than 2 hours in an 8-hour workday, sit less than 2 hours in an 8-hour workday, take several unscheduled breaks during an 8-hour workday, use her left upper extremity only 75 percent of an 8-hour workday, use fine finger manipulation only 15 to 20 percent of an 8-hour workday, and never use her right upper extremity to grasp, turn, and twist objects. (*Id.* at 955.) He also opined that Plaintiff needed to use a cane to walk, could not walk any city blocks, and would need periods of time during the workday to walk. (*Id.* at 954-55.)

## C.  <u>November 28, 2018 Hearing</u>

On November 28, 2018, Plaintiff and a vocational expert (VE) testified at a hearing before the ALJ. (*Id.* at 105-30.)  Plaintiff was represented by an attorney. (*Id.*)

10

1. *Plaintiff's Testimony*

Plaintiff testified that she was 54 years old, single, had no young children, and lived with a friend. (*Id.* at 107.) She was 5' 5.5" tall and weighed 260 pounds, having gained about 40 pounds over the prior two years because she was not active. (*Id.* at 109.) She attended a year of college and had been through training to be an assistant teacher. (*Id.* at 108-09.) She had not worked since September 18, 2016, the day she was involved in a car accident. (*Id.* at 110-11.) Her last job was at a call center for Culture Service Group, as a customer service representative, answering the phones, handling the mail, and fundraising. (*Id.*) Before that, she worked for an assisted living facility and a group home, providing home health care to patients. (*Id.* at 111-12.) From 2009 to 2012, she provided one-on-one assistance to a child with ADHD. (*Id.* at 112.) She had mostly worked for the Flint Board of Education as an assistant teacher from 1994 to 2012. (*Id.* at 112-13.)

Plaintiff injured her neck, back, arm, and right shoulder during her first car accident, and she was still having problems with her neck, back, and right shoulder. (*Id.* at 112.) Her neck pain was a "big knot" that came and went and worsened. (*Id.* at 113.) Her lower back pain was like an "intense labor pain all the time", "sharp, nudging, just throbbing", and it began at her waist and traveled down the back of her leg to her foot; it got as low as a level three or went as high as a level fifteen. (*Id.* at 115.) She had a sharp and intense "shooting" pain in her shoulder that went out to her fingers and came and went. (*Id.* at 113-15.) Plaintiff had trouble lifting a gallon of milk and could not carry it around. (*Id.* at 118-19.) She had told Dr. Panjwani that it was difficult to raise her arm above chest level and to push and pull with her right arm. (*Id.* at 114.) Her right shoulder pain interfered with her ability to grab and open, like to open the refrigerator and take something out of it, and/or hold onto things, like to hold a pen or pencil to write a letter to somebody. (*Id.* at 119-20.) In her prior jobs, she was able to handle, grab, and grasp objects during

11

an 8-hour workday, but she could no longer do that for 2 hours a day because the pain interfered with her ability to manipulate her fingers, such as to type. (*Id.* at 119-21.) Because of her shoulder pain, she needed help, including with washing her backside, getting out of the tub, and dressing. (*Id.* at 121-22.) She was still able to drive and drove every day. (*Id.* at 122.)

Plaintiff also testified that the arthritis in her knees had worsened after her car accident. (*Id.* at 116.) She had fallen at times and did not know why, but it was like she "buckled." (*Id.*) She had difficulty walking and had started using a cane "shortly after" the accident because she had trouble walking without holding onto something due to the pain. (*Id.* at 116-17.) She estimated that without the cane, she could stand for 10 or 15 minutes and walk from where she was seated to the door of the room in which the hearing took place. (*Id.* at 118.) She also estimated that with the cane, the furthest she could walk would be from the car to the room in which the hearing took place. (*Id.*) The walk had caused her pain*,* her back had started "crushing up," her neck had started "bulging up," and her knees were throbbing. (*Id.*)

*2. VE's Testimony*

The VE testified that she had reviewed Plaintiff's work history and determined that she had past relevant work as a customer service representative, (DOT 219.387-014, sedentary, SVP: 4); home attendant (DOT 354.377-014, medium, SVP: 3); and teacher aide (DOT 249.367-074, light, SVP: 3). (*Id.* at 124.) When asked about counsel's reference to the customer service representative job being a composite job because it involved mail handling, the VE added mail room clerk (DOT 209.687-026, light, SVP: 2). (*Id.*)

The ALJ asked the VE to consider a hypothetical individual with the same background as Plaintiff with the following limitations: lift and carry 20 pounds occasionally and carry 10 pounds frequently; stand and walk for 4 hours of an 8-hour workday, sit for 6 hours of an 8-hour workday,

both with normal breaks and rest periods; and occasionally stoop, kneel, crouch, and climb ramps and stairs. (*Id.* at 124.) She was able to push, pull, or operate hand controls without limitations; could not climb ladders, ropes, or scaffolds; and was limited to occasionally reaching overhead with the right upper extremity. (*Id.*) The VE responded that this hypothetical individual could perform the customer service representative position; if it was composite in the manner Plaintiff had performed it, however, the individual could not perform past relevant work. (*Id.* at 124-25.)

The ALJ then asked the VE to consider a hypothetical individual who had the RFC for occasional lifting and carrying of 10 pounds; frequently lifting and carrying less than 10 pounds; standing and walking at least 2 hours in an 8-hour day; sitting 6 hours out of 8; with no further limitations with regard to pushing and pulling and operation of hand and foot controls; occasionally climb ramps and stairs; occasionally stoop, kneel, and crouch, but not climb ladders, ropes, or scaffolds; and occasionally reach overhead. (*Id.* at 125.) The VE responded that a hypothetical individual with these limitations could perform a sedentary, semi-skilled SVP 4 job in customer service that did not also include mail room clerk work; there were transferable skills that transferred directly to that position without mail room clerk work. (*Id.* at 125-26.)

On cross-examination, the attorney contended that according to some of the physical examinations, Plaintiff was unable to raise her arm at shoulder level, which would support reduced reaching in all other directions. (*Id.* at 127.) He asked the VE to consider the same hypothetical individual as before, but with the limitation that "the reaching was reduced to occasional." (*Id.*) The VE opined that the individual would not be able to perform the past relevant work as a customer service representative because it required frequent reaching in all directions. (*Id.*)

The ALJ then asked the VE about the transferable skills she referenced earlier. (*Id.* at 128.) She testified that for a customer service job in the insurance industry, those included knowledge

13

of that industry, the authority to communicate with people, the ability to take complaints, interact with people, and solve problems, adjust complaints concerning billing or services rendered, and knowing how to refer somebody to resolve the problem. (*Id.*) Those skills transferred to other customer service jobs, such as an insurance clerk, with 236,000 jobs in the national economy and 23,000 jobs in Texas. (*Id.* at 129.) The VE noted that the position included reaching in all directions frequently. (*Id.*)

On further cross-examination, the VE confirmed that there were no jobs to which knowledge of the insurance industry, interacting with people, and solving problems, transferred directly. (*Id.*)

**D.  May 30, 2019 Hearing**

Plaintiff and a different VE testified at a supplemental hearing on May 30, 2019. (*Id.* at 85-101.)  Plaintiff was represented by an attorney. (*Id.* at 85.)

*1.  Plaintiff's Testimony*

Plaintiff testified that for the past 15 years, she had been employed at a call center, where she answered calls from insurance policy holders, processed outbound mail, and helped organize social events for management and employees. (*Id.* at 88-92.) Before that, she had worked at an assisted living facility, where she cared for residents by dispensing their medication, dressing them, and driving them to appointments. (*Id.* at 93.) From around December 4, 1994, until she retired, she worked as an assistant teacher for grades zero through six. (*Id.* at 94.)

*2.  VE's Testimony*

The second VE testified that she was familiar with jobs in the state of Texas and the national economy, that she had reviewed the exhibits in the record relating to vocational considerations, and that she did not need additional information before giving her opinion. (*Id.* at

14

94-95.) The VE determined that Plaintiff had worked in the previous 15 years as a home health provider (DOT 354.377-014, medium, semiskilled, SVP: 3); teacher assistant (DOT 099.327-010, light, SVP: 6); and customer service representative, which she classified as policy holder information clerk, DOT 249.262-010 (sedentary, skilled, SVP: 6), which encompassed mail and phone work. (*Id.* at 95.)

The ALJ asked the VE to consider a hypothetical individual with the same age, education, and work background as Plaintiff who had an RFC that allowed for occasionally lifting and carrying 10 pounds; frequently lifting and carrying less than 10 pounds; standing and walking for at least 2 hours of an 8-hour workday and sitting for about 6 hours of an 8-hour workday, with normal breaks and rest periods for both; with no additional limitations as to pushing and pulling; with no operation of hand and foot controls; and occasionally stooping, kneeling, crouching, and climbing ramps and stairs, but never climbing ladders, ropes, or scaffolds. (*Id.* at 95-96.) The VE responded that the hypothetical individual could perform the "customer service policy information holder" as Plaintiff had performed it and as performed in the general economy. (*Id.* at 96.)

The ALJ limited the hypothetical individual to no more than occasional overhead reaching with the bilateral upper extremities. (*Id.*) Noting that the DOT only says "reaching" and does not specify overhead, the VE ultimately responded that occasional overhead reaching with frequent reaching in all other directions would allow for past work. (*Id.*) The ALJ again limited the hypothetical individual to the use of a cane or other hand-held assistive device to walk and asked about the impact on the individual's ability to perform Plaintiff's past work. (*Id.* at 96-97.) The VE initially responded that there would be no impact, but then testified that it might "cause some issues" if the individual needed to use both hands, i.e., if the individual was walking with a bin of mail. (*Id.* at 97.)

15

The ALJ next asked whether occasional reaching in all directions would preclude Plaintiff's past work, and the VE confirmed that it would. (*Id.*) The VE also confirmed that a hypothetical individual with the same background as Plaintiff who could lift and carry 10 pounds or less, stand and walk for less than two hours of an 8-hour workday, and sit for less than 2 hours of an 8-hour workday, would be precluded from Plaintiff's past work as well as all other full-time competitive work in the economy. (*Id.*) A hypothetical individual's need for frequent unscheduled rest breaks of up to 30 minutes throughout the day would not allow for full-time competitive employment in the economy. (*Id.*) If a hypothetical individual was anticipated to miss four days a month on a regular, routine and ongoing basis, that would also not allow for maintaining competitive employment in the economy. (*Id.* at 98.)

On cross-examination, the VE confirmed that despite the use of a cane, the hypothetical individual could perform the regular duties of sitting at a desk and carrying a couple of pieces of mail. (*Id.*) If the hypothetical individual had to carry a bin using two hands, then she would not be able to perform the job. (*Id.*) The VE also confirmed that the job of policy holder information clerk had an SVP of 6 and would take one year to learn. (*Id.* at 99.)

The attorney noted that the first VE had indicated that Plaintiff's customer service representative position was a composite job comprised of a standard customer service representative, 219.387-014, and a mail room attendant, 209.687.026. (*Id.*) The second VE opined that the job was not a composite job even if Plaintiff did the mail every day as part of her responsibilities, however. (*Id.*) She explained that an individual performing the job she had identified "analyzes or answers questions, answer[s] requests by mail, telephone or in person for policyholders, beneficiaries, and other information concerning insurance policies"; "she did it by

mail, phone, other than . . . in person." (*Id.* at 99-100.) If the individual stood and walked for more than 2 hours of a workday, however, then it would "[p]ossibly" be a composite job. (*Id.* at 100.)

## E.  ALJ's Findings

The ALJ issued a decision denying benefits on October 23, 2019. (*Id.* at 14, 33-46.)  At step one, he found that Plaintiff had not engaged in substantial gainful activity from her alleged onset date of September 18, 2016. (*Id.* at 39.) At step two, the ALJ found that she had the severe impairments of degenerative disc disease, degenerative joint disease of the bilateral knees and shoulder, obesity, as well as non-severe impairments of asthma, hypertension, and gastroesophageal reflux disease. (*Id.*) At step three, the ALJ concluded that Plaintiff's impairments did not singularly or in combination meet or medically equal the required criteria for any of the listed impairments in 20 C.F.R. § 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926). (*Id.*) The ALJ noted that he had given specific emphasis to Listings 1.02 and 1.04. (*Id.*)

Next, the ALJ determined that Plaintiff retained the RFC to perform sedentary work as defined in 20 C.F.R. §§ 416.1567(a), 416.967(a), with the following limitations: lift and carry up to 10 pounds occasionally and less than 10 pounds frequently; walk or stand 2 hours of an 8-hour day; sit for 6 hours of an 8-hour day; occasionally climb ramps, stairs, ladders, ropes, or scaffolds; occasionally stoop, kneel, crouch; and occasionally reach overhead with the bilateral upper extremities and at least frequently reach in all other directions. (*Id.* at 40.)

At step four, the ALJ determined that Plaintiff had past relevant work as a policyholder information clerk, considering her age, education, work experience, and RFC. (*Id.* at 44.) He determined that she had not been under a disability, as defined by the Social Security Act, at any time from September 18, 2016, the alleged onset date, through the date of his decision. (*Id.* at 45.)

## II.   STANDARD OF REVIEW

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. §§ 405(g), 1383(C)(3). Substantial evidence is defined as more than a scintilla, less than a preponderance, and as being such relevant and sufficient evidence as a reasonable mind might accept as adequate to support a conclusion. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995). In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236. A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program. *Davis v. Heckler*, 759 F.2d 432, 435 (5th Cir. 1985). Moreover, the relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are identical to those governing the determination under a claim for supplemental security income. *See id.* The court may therefore rely on decisions in both areas without distinction in reviewing an ALJ's decision. *See id.*

To be entitled to social security benefits, a claimant must prove that he or she is disabled as defined by the Social Security Act. *Leggett*, 67 F.3d at 563-64; *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988). The definition of disability under the Social Security Act is "the inability to

engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step inquiry to determine whether a claimant is disabled:

1. An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2. An individual who does not have a "severe impairment" will not be found to be disabled.

3. An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4. If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

5. If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f)).

Under the first four steps of the analysis, the burden lies with the claimant to prove disability. *Leggett*, 67 F.3d at 564. The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id.* Once the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step five to show that there is other gainful employment available in the national economy that the claimant is capable of performing. *Greenspan*, 38 F.3d at 236. This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations or by expert vocational testimony or other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). A

finding that a claimant is not disabled at any point in the five-step review is conclusive and terminates the analysis. *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

### III.        ISSUES FOR REVIEW

Plaintiff lists one issue for review:

The ALJ**'s** RFC failed to incorporate all of the Plaintiff's functional limitations and restrictions stemming from her osteoarthritis of the knees. The ALJ failed to include the need for a cane in the found RFC and he failed to properly evaluate whether the Plaintiff met or equaled Listing 1.02. The ALJ's limitations stemming from the Plaintiff's degenerative joint disease of the shoulder was without medical support. The Plaintiff did not have past relevant work as a policyholder information clerk and her past relevant work was a composite job.

(doc. 20 at 5.) She also argues that the ALJ's RFC determination is contrary to *Ripley v. Chater*, 67 F.3d 552 (5th Cir. 1995), because he rejected all the medical opinion evidence relating to her ability to reach. (*Id.* at 18-21.)

### A.  <u>Functional Limitations</u>

Plaintiff argues that the ALJ's RFC did not include the functional limitations "stemming from her osteoarthritis of the bilateral knees" because he failed to incorporate her use of a cane and to properly consider whether she met or equaled a listing. (doc. 20 at 10-11.)

### *1.  Need for a Cane*

"The Social Security regulations recognize that hand-held assistive devices can impact a claimant's 'functional capacity by virtue of the fact that one or both upper extremities are not available for such activities as lifting, carrying, pushing, and pulling.'" *Duenes v. Kijakazi*, No. CV 4:20-2629, 2022 WL 19614, at *7 (S.D. Tex. Jan. 3, 2022) (citing 20 C.F.R. pt. 404, subpt. P, app. 1 § 1.00(J)(4)). An ALJ need not consider an assistive walking device in the RFC determination unless the device is medically necessary, however. *Id.* "The law is clear that 'to find

a hand-held assistive device is medically required, there must be medical documentation establishing the need for a hand-held device to aid in walking or standing, and describing the circumstances for which it is needed (i.e., whether all the time, periodically, or only in certain situations; distance and terrain; and any other relevant information).'" *Id.* (citing Social Security Ruling (SSR) 96-9p, 1996 WL 374184, at *7). The ALJ "must always consider the particular facts of a case," *id.* (citing SSR 96-9p, 1996 WL 374185, at *7), and neither a prescription for a hand-held assistive device, nor a lack of one, is "necessarily dispositive of medical necessity," *id.* (citation omitted).

Here, the ALJ did not incorporate Plaintiff's use of a cane into his RFC determination. He expressly found that while imaging showed that she had degenerative disc disease, degenerative joint disease, and osteoarthritis, she had normal muscle strength, normal grip strength, and negative straight leg raises during some examinations. (doc. 17-1 at 43.) He also noted that the medical record was inconsistent, indicating she presented at some examinations with a cane and without a cane at others. (*Id.*)

Plaintiff references the clinical note from her physical therapist with the recommendation that she used a cane to walk, (docs. 17-1 at 991; 20 at 12-13), but it merely contains a recommendation and does not indicate that Plaintiff needs it to walk or stand, *see Duenes*, 2022 WL 19614, at *7. Plaintiff points to her testimony that her doctor gave her the cane to help her walk after her first motor vehicle accident. (docs. 17-1 at 117; 20 at 12-13.)[3] Her testimony is not medical documentation and does not describe the circumstances for which the cane is needed,

---

[3] Her work history report stated that she used a cane or an electric wheelchair when shopping, but noted that neither was prescribed to her by a doctor, "only sug[g]ested." (doc. 17-1 at 407.)

including duration, distance, and terrain. *See* SSR 96-9p, 1996 WL 374185, at *7; *see also Chambliss v. Massanari*, 269 F.3d 520, 522 (5th Cir. 2001) (finding that subjective complaints must be corroborated by objective medical evidence); *Villa v. Sullivan*, 895 F.2d 1019, 1024 (5th Cir. 1990) (referencing *Hollis v. Bowen*, 837 F.2d 1378, 1385 (5th Cir. 1988) ("Subjective evidence need not take precedence over objective evidence.")). Although she argues that her bilateral knee osteoarthritis became worse in 2018 and 2019, after the 2017 consultative examination, she cites a physical therapists note in 2019 that only recommended a cane. (*See* doc. 20 at 14-15.) Moreover, even a prescription is not "necessarily dispositive of medical necessity," and the ALJ must still consider the particular facts of the case. *Duenes*, 2022 WL 19614, at *7.

Here, the ALJ discussed inconsistent evidence in the record regarding her ability to ambulate with and without a cane. (doc. 17-1 at 42-44.)  Substantial evidence shows that she ambulated without a cane in 2017 and the months before the supplemental hearing. *See Villa*, 895 F.2d at 1024 (referencing *Hollis*, 837 F.2d at 1385) ("[A] factfinder's evaluation of the credibility of subjective complaints is entitled to judicial deference if supported by substantial record evidence."); doc. 17-1 at 707, 731, 734, 906.  Because the records were inconsistent as to whether she used a cane to ambulate and do not show that the cane was medically necessary, Plaintiff failed to meet her burden to show that she required a cane to ambulate.  *See Stewart v. Colvin*, No. 1:12-CV-039-BL, 2013 WL 1979738 at *5 (N.D. Tex. May 14, 2013) (finding no error when the ALJ failed to incorporate the use of a cane in a claimant's RFC because the record contained no evidence regarding the medical basis for the cane and there was "no physician's report regarding

specific medical restrictions requiring [the claimant] to use an assistive device"). Accordingly, remand is not required on this basis.[4]

### 2. Listing 1.02

Plaintiff also contends that the ALJ "failed to properly consider whether [she] met Listing 1.02". (doc. 20 at 17.)

At step two, the ALJ determined that Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Subpart P, Appendix 1. (doc. 17-1 at 39.) In reaching his decision, he "carefully" considered Plaintiff's signs, symptoms, and laboratory findings with the criteria specified in all of the Listings of Impairments, giving "[s]pecific emphasis" to Listing 1.02. (*Id.*) The ALJ determined that Plaintiff's impairments did not meet Listing 1.02, "because the record failed to establish that [her] joint dysfunction resulted in an inability to ambulate effectively, or inability to perform fine and gross movements effectively." (*Id.*)

If a claimant is not working and is found to have a severe impairment at step two that meets the duration requirement, the ALJ must determine at step three whether the claimant's impairment meets or medically equals one of the impairments listed in the regulations. *Compton v. Astrue*, No. 3:09-CV-051513-B-BH, 2009 WL 4884153, at *6 (N.D. Tex. Dec. 16, 2009) (citing 20 C.F.R. § 404.1520). The listed impairments in the Social Security regulations "are descriptions of various physical and mental illnesses ... most of which are categorized by the body system they affect."

---

[4] Because the ALJ did not err in finding that Plaintiff's cane was not a medical necessity, the court need not reach the Commissioner's alternative argument that any error was harmless because the use of a cane would not impact her ability to perform her past relevant work. (*See* doc. 23 at 11.)

*Sullivan v. Zebley*, 493 U.S. 521, 529-30 (1990). "Each impairment is defined in terms of several specific medical signs, symptoms, or laboratory test results." *Id.* at 530. If the claimant's impairment meets or medically equals a listed impairment, the disability inquiry ends, and the claimant is entitled to benefits. 20 C.F.R. § 404.1520(d).

"Listings criteria are 'demanding and stringent.'" *Lewis v. Barnhart*, 431 F. Supp. 2d 657, 661 (E.D. Tex. 2006) (citing *Falco v. Shalala*, 27 F.3d 160, 162 (5th Cir. 1994)). The claimant bears the burden of proving that his impairments meet or equal the criteria found within the Listings. *Henson v. Barnhart*, 373 F. Supp. 2d 674, 685 (E.D. Tex. 2005) (citing *McCuller v. Barnhart*, 72 F. App'x 155, 158 (5th Cir. 2003)); *Selders v. Sullivan*, 914 F.2d 614, 619 (5th Cir. 1990). To meet a listed impairment, the claimant's medical findings, i.e., symptoms, signs, and laboratory findings, must match all those described in the listing for that impairment, because an impairment cannot meet a listing based only on a diagnosis. 20 C.F.R. § 404.1525(d). "An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Sullivan*, 493 U.S. at 530. To equal a listing, the claimant's unlisted impairment must be "at least equal in severity and duration to the criteria of any listed impairment." 20 C.F.R. § 404.1526(a). The claimant "must present medical findings equal in severity to all the criteria for the one most similar listed impairment." *Sullivan*, 493 U.S. at 531 (emphasis in original); *see* 20 C.F.R. § 404.1526(b)(2). "When a claimant fails to sustain that burden, courts must conclude that substantial evidence supports the ALJ's finding that Listings-level impairments are not present." *Lewis*, 431 F. Supp. 2d at 661 (citing *Sullivan*, 493 U.S. at 530 ("For a claimant to show that his impairment matches a listing, it must meet all of the specified medical criteria"); *Selders*, 914 F.2d at 619; *Washington v. Barnhart*, 413 F. Supp. 2d 784, 793 (E.D. Tex. 2006); 20 C.F.R.

§ 416.926(d) (2005)). "Importantly for this case, a claimant may not establish Listings level severity through subjective testimony." *Id.* (citation omitted). The ALJ is to consider all of the evidence that is relevant to the claimant's impairments and their effects, but must not consider vocational factors such as age, education, and work experience. 20 C.F.R. § 404.1526(c); *see Sullivan*, 493 U.S. at 531-32 (explaining that the overall functional impact of the claimant's unlisted impairment or combination of impairments cannot be used to justify the determination of equivalence of a listed impairment). "[T]he responsibility for deciding medical equivalence rests with the [ALJ]." 20 C.F.R. § 416.1526(e).

> Listing 1.02 involves major dysfunction of a joint(s):
>
> [c]haracterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s).

20 C.F.R. pt. 404, subpt. P, app.1, § 1.02. Listing 1.02(A) also requires "[i]nvolvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b." *Id.* The "inability to ambulate effectively" is defined as "an extreme limitation of the ability to walk," "i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities." *Id.* § 1.00(B)(2)(b)(1). Some examples of ineffective ambulation include "the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail." *Id.* § 1.00(B)(2)(b)(2).

25

Conversely, "individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living" to be considered able to "ambulate effectively." *Id.* Such individuals "must have the ability to travel without companion assistance to and from a place of employment or school." *Id.* Nevertheless, "[t]he ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation." *Id.*

Here, Plaintiff has pointed to no medical evidence that establishes the necessary criteria to meet Listing 1.02(A) for bilateral knee osteoarthritis.[5] As noted, her subjective complaints cannot be considered in determining whether she meets a listing. *See Lewis*, 431 F. Supp. 2d at 662. Additionally, none of the medical records she referenced show that she is unable to ambulate effectively or has "an extreme limitation of the ability to walk." *See* 20 C.F.R. pt. 404, subpt. P, app.1, § 1.00(B)(2)(b)(1). Those records show that besides using a cane, she had normal gait or "5/5" muscle strength bilaterally. (doc. 17-1 at 857, 929.) The medical evidence shows she ambulated "independently," "without difficulty," and/or with steady gait, which is inconsistent with her complaint that she is unable to ambulate effectively. (*Id.* at 42, 845, 906-07.)

Moreover, even if Plaintiff met the requirements of 1.02(A), she must show that she is unable to ambulate effectively as described in Listing 1.00(B)(2)(b)(2). The record indicates that Plaintiff ambulates with the help of a single cane, (*id.* at 845, 852, 924, 929, 963, 955), not a walker, two crutches, or two canes. As noted, the use of a single cane does not qualify an individual for Listing 1.02. *See* 20 C.F.R. pt. 404, subpt. P, app.1, § 1.00(B)(2)(b)(1). *See Sullivan*, 493 U.S.

---

[5] Although Plaintiff refers to Listing 1.02, she quotes the definition of Listing 1.02(A) and does not reference or discuss any other provisions of Listing 1.02 that her impairments might have met or equaled. (*See* doc. 20 at 16-18.)

at 530 ("An impairment that manifests only some of those criteria, no matter how severely, does not qualify.").

Because the ALJ considered the medical evidence and explained his conclusions and determinations at step three, and Plaintiff has not shown that she is unable to ambulate effectively, the ALJ did not commit legal error. *See Washington*, 413 F. Supp. 2d at 795 ("[B]ecause the evidentiary record before the court fails to disclose a basis for finding Listings level severity for plaintiff's severe impairments, plaintiff failed to carry his burden of proof. In that circumstance, the court must conclude that substantial evidence supports the Commissioner's Step 3 finding."). Remand is not warranted on this basis.[6]

## B. *Ripley* Error

Plaintiff also argues that the ALJ's determination that she could reach overhead occasionally and in all other directions frequently was without medical support. (doc. 20 at 18-21.)

---

[6] Plaintiff also argues that "[a] medical expert would have determined that [she] met Listing 1.02 or concluded a cane was necessary", and that the ALJ's findings were not an accurate assessment of her ability to perform work-related activities because she did not have a consultative examination. (doc. 20 at 15, 18-19.) An ALJ has a duty to fully and fairly develop the facts relative to a claim for benefits. *Newton v. Apfel*, 209 F.3d 448, 458 (5th Cir. 2000) (citing *Ripley v. Chater*, 67 F.3d 552, 557 (5th Cir. 1995)). When the ALJ fails in this duty, he does not have before him sufficient facts upon which to make an informed decision, and his decision is not supported by substantial evidence. *Brock v. Chater*, 84 F.3d 726, 728 (5th Cir. 1996) (per curiam) ("When a claimant is not represented by counsel, the ALJ owes a heightened duty to 'scrupulously and conscientiously explore all relevant facts'"); *Kane v. Heckler*, 731 F.2d 1216, 1219 (5th Cir. 1984). The ALJ's duty to develop the record "is triggered only when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence." *Mayes v. Massanari*, 276 F.3d 453, 459-60 (5th Cir. 2001). Here, Plaintiff was represented by counsel at the hearing, so no "heightened duty to scrupulously and conscientiously explore all relevant facts" arose. *Castillo v. Barnhart*, 325 F.3d 550, 552-53 (5th Cir. 2003) (per curiam); *see, e.g., Isbell v. Colvin*, No. 1:14-CV-006-C, 2015 WL 1208122, at *3 n.1 (N.D. Tex. Mar. 16, 2015) (noting that the ALJ did not have a heightened duty to develop the record where the claimant was represented by counsel). The duty to obtain medical records generally belongs to the claimant. *See Gonzalez v. Barnhart*, 51 F. App'x 484 (5th Cir. 2002); *Hawkins v. Astrue*, No. 3:09-CV-2094-BD, 2011 WL 1107205 at *7 (N.D. Tex. Mar. 25, 2011). Notwithstanding her failure to specifically list this issue, Plaintiff has not shown how the ALJ failed in his duty to develop the record on this issue, or any prejudice resulting from the alleged error.

In *Ripley v. Chater*, 67 F.3d 552 (5th Cir. 1995), the claimant argued that the ALJ failed to develop the record fully and fairly by finding that he could perform sedentary work even though there was no medical testimony to support that conclusion. The Fifth Circuit noted that although an ALJ should usually request a medical source statement describing the types of work that the applicant was still capable of performing, the absence of such a statement did not necessarily make the record incomplete. *Ripley*, 67 F.3d at 552. Rather, the court had to consider whether there was substantial evidence in the record to support the ALJ's decision. *Id.* The record contained "a vast amount of medical evidence" establishing that the claimant had a back problem, but it did not clearly establish the effect of that problem on his ability to work, so the ALJ's RFC determination was not supported by substantial evidence. *Id.* The Fifth Circuit remanded the case with instructions to the ALJ to obtain a report from a treating physician. *Id.* at 557-58. Notably, it rejected the Commissioner's argument that the medical evidence discussing the extent of the claimant's impairment substantially supported the ALJ's RFC assessment, finding that it was unable to determine the effects of the claimant's condition on his ability to work absent reports from qualified medical experts. *Id.* at 558 n.27; *see also Oderbert v. Barnhart*, 413 F. Supp. 2d 800, 803 (E.D. Tex. 2006) ("*Ripley* clarifies that an [ALJ] cannot determine from raw medical data the effects of impairments on claimants' ability to work.").

1. *Determination*

Here, the ALJ did not explain how he determined that Plaintiff was able to reach overhead with the bilateral upper extremities occasionally and in all other directions at least frequently. (*Id.* at 40, 43.) He considered the opinions of the SAMCs and expressly found them "less persuasive" because evidence at the hearing supported greater limitations than those they contemplated. (doc.

28

17-1 at 44; *see id.* at 153-172.) He also considered the opinions of FNP Siachitema, including his opinion that Plaintiff was limited to never using her right upper extremity for "g[r]asping, turning or reaching", and found them "not persuasive" because they were inconsistent both internally and with the medical evidence of record showing that Plaintiff "had normal muscle strength and sensation during exams." (*Id.* at 43, 44; *see id.* at 952.) The ALJ considered the consultative examination completed by Dr. Panjwani, including his diagnosis of chronic right shoulder pain with history or rotator cuff tear, but he did not mention his notation that Plaintiff had been told to have rotator cuff surgery and had difficulty raising her arm above her chest level. (*Id.* at 41-42; *see id.* at 698, 700.) The ALJ noted that Dr. Rojas examined Plaintiff on three separate occasions after her first car accident, including Dr. Rojas' observation that she had limited range of motion in the right shoulder and could not raise her arm above the shoulder. (*Id.* at 41; *see id.* at 686-91.) The ALJ also noted that Dr. Clemence examined Plaintiff for right shoulder pain and found range of motion "was 2/4 with pain, and she had positive supraspinatus, deltoid, Hawkins, Neer and apprehension signs," "weak rotator cuff, and tenderness around the anterior and posterior acromion, scapular tenderness and trapezial tenderness." (*Id.* at 41; *see id.* at 685.) He did not mention Dr. Clemence's notation that Plaintiff rated her pain as "7/10 to include night pain, pain with pushing, pulling, lifting, *reaching and overhead work*", and that he diagnosed her with a rotator cuff tear of the supraspinatus. (*See id.* (emphasis added).)

The ALJ did state the RFC was supported by "imaging" showing that Plaintiff had degenerative disc disease, degenerative joint disease, and osteoarthritis, "with limited range of motion in the neck, back[,] and shoulder at times". (*Id.* at 43; *see id.* at 680-84, 696-701, 832-98.)

He also referenced the clinical notes, including a February 26, 2019 visit, which indicated that Plaintiff exhibited decreased range of motion in the bilateral shoulders. (*Id.* at 42, 920.)

There are no medical opinions in the record regarding the effects that Plaintiff's severe impairment of degenerative joint disease of the shoulder, or her chronic shoulder pain and limited range of motion in her right shoulder, had on her ability to work. The ALJ appears to have relied on his own interpretation of the medical and other evidence, which he may not do. *See Williams v. Astrue*, 355 F. App'x 828, 832 n.6 (5th Cir. 2009) ("An ALJ may not–without the opinions from medical experts–derive the applicant's [RFC] based solely on the evidence of his or her claimed medical conditions, [and] an ALJ may not rely on his own unsupported opinion as to the limitations presented by the applicant's medical conditions."); *see also Tyler v. Colvin*, No. 3:15-CV-3917-D, 2016 WL 7386207 (N.D. Tex. Dec. 20, 2016) (finding that an ALJ impermissibly relied on his own medical opinion to develop his RFC determination); *Davis v. Astrue*, No. 1:11-CV-00267-SA-JMV, 2012 WL 6757440 (N.D. Miss. Nov. 6, 2012) ("In formulating a claimant's RFC, the ALJ-a layperson-may not substitute his own judgment for that of a physician."), *adopted by* 2013 WL 28068 (N.D. Miss. Jan. 2, 2013). Consequently, substantial evidence does not support the ALJ's RFC determination. *See Geason v. Colvin*, No. 3:14-CV-1353-N, 2015 WL 5013877, at *5 (N.D. Tex. July 20, 2015) ("Because the ALJ erred in making an RFC determination without medical evidence addressing the effect of Plaintiff's impairment on her ability to work, the ALJ's decision is not supported by substantial evidence."); *Medendorp v. Colvin*, No. 4:12-CV-687-Y, 2014 WL 308095, at *6 (N.D. Tex. Jan. 28, 2014) (finding because the ALJ rejected the only medical opinion in the record that he had analyzed that explained the effects of the claimant's impairments on her ability to perform work, there was no medical evidence supporting the ALJ's

RFC determination); *Lagrone v. Colvin*, No. 4:12-CV-792-Y, 2013 WL 6157164, at *6 (N.D. Tex. Nov. 22, 2013) (finding substantial evidence did not support the ALJ's RFC determination where the ALJ rejected all medical opinions in the record that might explain the effects of the claimant's physical impairments on his ability to perform work and where there were no such opinions as to claimant's mental impairments).

### 2. *Harmless Error*

Because "[p]rocedural perfection in administrative proceedings is not required" and a court "will not vacate a judgment unless the substantial rights of a party have been affected," Plaintiff must show she was prejudiced by the ALJ's failure to rely on medical opinion evidence in assessing her RFC. *See Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988) (per curiam). To establish prejudice, she must show that the ALJ's failure to rely on a medical opinion as to the effects her impairments had on her ability to work casts doubt onto the existence of substantial evidence supporting her disability determination. *See McNair v. Comm'r of Soc. Sec. Admin.*, 537 F. Supp. 2d 823, 837 (N.D. Tex. 2008) ("Procedural errors in the disability determination process are considered prejudicial when they cast doubt onto the existence of substantial evidence in support of the ALJ's decision.") (citing *Morris v. Bowen*, 864 F.2d 333, 335 (5th Cir. 1988)).

The ALJ's failure to rely on a medical opinion regarding her ability to reach in determining Plaintiff's RFC casts doubt as to whether substantial evidence exists to support the finding that she is not disabled. *See Williams*, 355 F. App'x at 832 (finding the decision denying the claimant's claim was not supported by substantial evidence where the RFC was not supported by substantial evidence because the ALJ rejected the opinions of the claimant's treating physicians and relied on his own medical opinions as to the limitations presented by the claimant's back problems in

determining the RFC); *see also Thornhill*, 2015 WL 232844, at *11 (finding prejudice "where the ALJ could have obtained evidence that might have changed the result—specifically, a medical source statement"); *Laws v. Colvin*, No. 3:14-CV-3683-B, 2016 WL 1170826 (N.D. Tex. Mar. 25, 2016) (reversing and remanding for further proceedings for lack of substantial evidence because the ALJ's failure to rely on a medical opinion in determining the plaintiff's RFC). Accordingly, the error is not harmless, and remand is required on this issue.[7]

### IV.    RECOMMENDATION

The Commissioner's decision should be **REVERSED in part**, and the case should be **REMANDED** for further proceedings**.**

SO RECOMMENDED on this 7th day of March, 2022.

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

---

[7] Because remand is recommended based on the ALJ's *Ripley* error, and determination of Plaintiff's RFC on remand will likely affect the remaining issues, they will not be addressed here.

## INSTRUCTIONS FOR SERVICE AND
## NOTICE OF RIGHT TO APPEAL/OBJECT

A copy of these findings, conclusions and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of these findings, conclusions and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE